# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 35703

STATE OF IDAHO, )
)
Plaintiff-Respondent, )
)
v. )
)
SIMONA LISA MANZANARES, )
)
Defendant-Appellant. )
)

Boise, June 2011 Term

2012 Opinion No. 9

Filed: January 6, 2012

Stephen W. Kenyon, Clerk

_____

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. Thomas J. Ryan, District Judge.

Judgment entered upon guilty plea to recruiting criminal gang member, affirmed.

Molly Huskey, State Appellate Public Defender, Boise, for appellant. Erik R. Lehtinen, Deputy Appellate Public Defender argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. Kenneth K. Jorgensen, Deputy Attorney General argued.

_____

BURDICK, Justice

Simona Manzanares appeals from the judgment entered following her guilty plea under a conditional plea agreement. She pled guilty to recruiting a criminal gang member under I.C. § 18-8504(1)(a) in exchange for the dismissal of a charge for providing a firearm to a criminal gang member under I.C. § 18-8505. On appeal, Manzanares argues that: (1) I.C. § 18-8504(1)(a) (the "Recruiting Provision") is unconstitutionally overbroad on its face and as applied for encroaching on the First Amendment right to free association; (2) I.C. § 18-8505 (the "Firearm Provision") is unconstitutionally overbroad as applied for punishing her expressive conduct, unconstitutionally vague on its face and as applied for failing to adequately define "gang member," and unconstitutional under the Second Amendment of the United States Constitution and Article I, Section 11 of the Idaho Constitution for prohibiting a class of persons from keeping or bearing arms; (3) her conviction violates the *ex post facto* clauses of the United States and Idaho constitutions; (4) the district court erred in failing to dismiss the information based on

1

the information's failure to enumerate all elements of the charged offenses; and (5) the district court erred in failing to dismiss the information based on insufficient evidence offered at the preliminary hearing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The legislature adopted the Idaho Criminal Gang Enforcement Act ("ICGEA"), I.C. §§ 18-8501 *et seq.*, effective March 24, 2006. 2006 Idaho Sess. Laws, ch. 184, § 1, pp. 582–85.[1] On February 27, 2007, Manzanares was charged with committing two felonies under the ICGEA: (1) recruiting a criminal gang member in violation of I.C. § 18-8504(1)(a); and (2) supplying a firearm to a gang member in violation of I.C. § 18-8505.

Under the Recruiting Provision, "[a] person commits the offense of recruiting criminal gang members by . . . [k]nowingly soliciting, inviting, encouraging or otherwise causing a person to actively participate in a criminal gang." Idaho Code § 18-8504(1)(a).[2] Count I of the Information (the "Recruiting Charge"), alleged that Manzanares, from about September 21, 2006, until about February 2, 2007, "did knowingly solicit, invite, encourage or otherwise cause a person to actively participate in a criminal gang, The East Side Locas" in violation of the Recruiting Provision.

Under the Firearm Provision, "[a] person commits the offense of supplying firearms to a criminal gang if the person knows an individual is a gang member and supplies, sells or gives possession or control of any firearm to that gang member." Idaho Code § 18-8505(1).[3] Count II

---

[1] The ICGEA's Statement of Purpose provides in part:

> This legislation is the result of recommendations made by the Governor's Criminal Justice Commission. Gang activity has become increasingly prevalent in Idaho, and it is important that law enforcement agencies, prosecutors, and judges have the necessary tools to address this issue. This legislation provides definitions; extends sentences for gang members who commit certain crimes; criminalizes recruitment of criminal gang members; and creates a new felony for supplying firearms to a criminal gang member.

S.B. 1336, R.S. 1584 58th Leg., 2d Reg. Sess. (Idaho 2006).

[2] Idaho Code § 18-8504, entitled "Recruiting criminal gang members", provides in full:

> (1) A person commits the offense of recruiting criminal gang members by:
> > (a) Knowingly soliciting, inviting, encouraging or otherwise causing a person to actively participate in a criminal gang; or
> > (b) Knowingly using force, threats, violence or intimidation directed at any person, or by the infliction of bodily injury upon any person, to actively participate in a criminal gang.
> (2) A person convicted of a violation of this section shall be imprisoned for a term not to exceed ten (10) years.
> (3) This section shall not be construed to limit prosecution under any other provision of law.

[3] Idaho Code § 18-8505, entitled "Supplying firearms to a criminal gang", provides in full:

of the Information (the "Firearm Charge"), alleged that Manzanares, on or about October 13, 2006, in Canyon County "did knowingly supply, sell, or give possession or control of a firearm to Jackie Trinidad who the defendant knew to be a criminal gang member" in violation of the Firearm Provision.

Manzanares waived her preliminary hearing, and on March 21, 2007, she was bound over to the district court. The State filed the Information on March 22, 2007. Manzanares moved to dismiss both charges, arguing that the Recruiting Provision violates both the First Amendment of the United States Constitution and Article I, sections 9 and 10 of the Idaho Constitution and is unconstitutionally vague. She also argued that the Firearm Provision violates the Second Amendment of the United States Constitution and Article I, Section 11 of the Idaho Constitution. Finally, she argued that the Recruiting Charge failed to provide adequate notice of the alleged conduct believed to be criminal. Manzanares filed a Supplementary Motion to Dismiss, arguing that the statutory definition of "criminal gang member" in I.C. § 18-8502(2) is unconstitutionally vague to the extent that it applies to the Recruiting Provision and the Firearm Provision, both statutes are unconstitutionally overbroad, both charges fail to provide adequate notice of the alleged conduct believed to be criminal, and the Firearm Provision is unconstitutionally vague.

On July 27, 2007, the district court held a hearing to consider Manzanares's motion to dismiss. On August 7, 2007, the district court conditionally granted the motion to dismiss the Recruiting Charge due to the vagueness of the charging language and gave the State seven days to amend the Information to include the name of the person Manzanares allegedly recruited. The district court denied Manzanares's motion to dismiss as to all other grounds raised by Manzanares.

The State submitted the Amended Information on August 7, 2007. The Recruiting Charge was amended to name Jackie Trinidad as the person Manzanares allegedly recruited and to change the date of the alleged recruiting (from April 1, 2006, to February 27, 2007). The Firearm Charge was amended to change the date on which Manzanares allegedly supplied a firearm to Trinidad (from May 1, 2006, to May 15, 2006).

---

(1) A person commits the offense of supplying firearms to a criminal gang if the person knows an individual is a gang member and supplies, sells or gives possession or control of any firearm to that gang member.

(2) Subsection (1) of this section shall not apply to a person who is convicted as a principal to the offense committed by the recipient of the firearm.

(3) A person convicted of a violation of this section shall be imprisoned for a term not to exceed ten (10) years or be fined an amount not to exceed fifty thousand dollars ($50,000), or both.

3

On August 9, 2007, the parties submitted a Stipulation to Remand Proceeding for Preliminary Hearing, because the Amended Information included information not previously disclosed to the Defendant: that Trinidad was the person allegedly recruited by Manzanares. The district court remanded the case to the magistrate judge for a preliminary hearing, which was held on August 30, 2007

At the preliminary hearing, the State called Corporal Joey Hoadley of the Caldwell Police Department to testify. Corporal Hoadley testified that he has had contact with Manzanares on numerous occasions and that she admitted to him that she is a member of the East Side Locos and that she is the leader of the female branch of the East Side Locos, called the East Side Locas. Corporal Hoadley then testified to specific encounters he had with Manzanares, setting forth various facts associating her with the East Side Locos and East Side Locas.

According to Corporal Hoadley, State's Exhibit 1, which is a photograph obtained from a vehicle in which Manzanares was riding with a gang member who was arrested, depicts Jackie Trinidad at Manzanares's home, wearing gang attire and holding a firearm with Manzanares standing behind her and flashing the common gang sign for the East Side Locos or East Side Locas. Corporal Hoadley also testified as to State's Exhibit 2, which he says is a copy of Manzanares's MySpace webpage and includes pictures of Manzanares, pictures of other members of the East Side Locos and East Side Locas and numerous other gang references.

Corporal Hoadley testified that on December 5, 2006, Manzanares voluntarily spoke with him at the Caldwell Police Department. She admitted to being the leader of the East Side Locas. She said that membership in the East Side Locas had dwindled from approximately twenty members initially to less than ten members as people moved, got married, became pregnant, and were incarcerated. She explained that to become a member of the gang one must go through an initiation process called the "jump in", which involves being battered by several gang members for a specified amount of time. She said that the gang funds itself by selling illegal narcotics, by "house shopping" (burglarizing a house), and by "car shopping" (burglarizing a car).

Finally, Corporal Hoadley testified on State's Exhibit 3, which included an audio recording from Manzanares's MySpace webpage, which he identified as the voice of Manzanares. He testified that based on his expertise on gangs, the language from the audio recording ("For all your Surenos out there keep bangin', homies.") "is encouraging people to continue in gang activity, committing crimes, committing violence."

4

The State also called Jackie Trinidad to testify at the preliminary hearing. Trinidad testified that on December 31, 2005, she attended a New Year's Eve party at Manzanares' sister's house. She testified that she and others were drinking alcohol at the party and that one of her friends asked her if she wanted to get jumped in. She testified that Manzanares was at the party and that Manzanares did not say anything about jumping her in but that Manzanares did join others in hitting her as part of the jumping in. When asked what she does as a member of the East Side Locas, Trinidad said: "Not really anything, like we would just hang out, go to [Manzanares's] house, have barbecues."

Trinidad testified that the reason she attended the 2005-2006 New Year's Eve party (at which she was jumped in to the East Side Locas) was that her friend Maria wanted to go. Trinidad testified that she hardly knew Manzanares prior to that party and had not previously talked to Manzanares about the East Side gangs. She testified that Maria told her at the party that someone, maybe but not specifically Manzanares, did not want people coming over who were not "Eastsiders."

Trinidad also testified that at a barbecue at Manzanares's house in May 2006, she and Manzanares went to the garage because "that's where all the beer was", and while in the garage, Manzanares "showed [a gun] to me and like we decided to take pictures." Trinidad explained that the gun was wrapped up in a towel on a couch in the garage, Manzanares gave the gun to her, and they both decided to take the picture, which was submitted as State's Exhibit 1 (the photograph about which Corporeal Hoadley testified). Trinidad testified that in the photograph, she is holding a gun and wearing a jersey with the number 13, which she wore to show that she was a member of the gang, and Manzanares is "throwing up Eastside." Trinidad testified that Manzanares knew Trinidad was a gang member on the day of the barbecue and that this was an East Side barbecue. On cross examination, Trinidad testified that the photograph depicts the only time she ever handled the gun, and the only reason she handled it was for the purpose of taking the photograph.

Trinidad also testified that she knew Manzanares had a website and that she had listened to the audio message (State's Exhibit 3). She testified that Manzanares encouraged East Side members to go tagging, which involves spray-painting messages and symbols related to the East Side gangs in public places, but that "nobody really ever did anything" and "[o]nly the guys did [go tagging]."

At the conclusion of the preliminary hearing, the magistrate found that there was probable cause for both the Recruiting Charge and the Firearm Charge, explaining:

> The jumping in is sufficient enough for the language of [the Recruiting Charge] that was testified to by Ms. Trinidad. With regard to the [Firearm Charge], once again, the photograph, the testimony indicates she . . . handed her the gun. Therefore, Jackie Trinidad did in fact, after becoming a gang member and known to Ms. Manzanares, have possession of a firearm.
>
> The statute further provides, however, that a—it has to be a criminal gang, as defined by the statute, which was the issue the Court had. The definition of a criminal gang is set out in Idaho Code 18-8502, Subsection 1, and requires a whole number of elements, the first of which—all of which in the paragraph are met up until we get to the point of a further definition. It refers to paragraph 3 in that same code section, and paragraph 3 is the definition of pattern of criminal gang activity and requires language to qualify as a pattern of gang activity there could be two or more convictions or offenses, certain enumerated charges. However, Subsection 1 doesn't say it has to be convictions. And there is testimony before the Court that the defendant told the officer that they had been—they engaged in certain activities, none of which are shown convictions or proven, but they are enumerated in 3(a) though.
>
> And, as a result, I'm going to bind over since you can all brief this statute to death.

The magistrate filed an Order Binding Defendant Over to District Court.

On September 4, 2007, the State filed the Second Amended Information. In this final version of the information, the Recruiting Charge alleges that Manzanares recruited Trinidad sometime from April 1, 2006, to February 26, 2007, and the Firearm Charge alleges that Manzanares gave Trinidad possession of a firearm sometime from May 1 through 15, 2006.

Manzanares was arraigned on September 7, 2007. On December 17, 2007, Manzanares filed another motion to dismiss, arguing that the evidence offered at the preliminary hearing was insufficient to bind her over and reasserting her previous motion to dismiss. On January 22, 2008, the district court held a hearing on the motion to dismiss, and on February 8, 2008, the district court denied the motion, finding that there was substantial evidence upon which the magistrate could find probable cause as to both the Recruiting Charge and the Firearm Charge.

On June 27, 2008, Manzanares moved to dismiss in light of the United States Supreme Court decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). It does not appear that this motion was ever heard or decided.

On July 10, 2008, Manzanares entered into a conditional plea agreement. She agreed to enter an *Alford* plea[4] to the Recruiting Charge in exchange for dismissal of the Firearm Charge. Manzanares reserved her right to appeal "the issue of the constitutionality of the charge and statute, and such other matters that might appear in the record of this action." The district court accepted Manzanares's plea and dismissed the Firearm Charge. On August 28, 2008, following a two-day sentencing hearing, the district court imposed a ten-year unified sentence with two years fixed for the Recruiting Charge.

On September 11, 2008, the district court entered the Judgment and Commitment, and on September 25, 2008, Manzanares filed the Notice of Appeal to this Court.

## II. STANDARD OF REVIEW

As set forth in *State v. Korsen*, 138 Idaho 706, 711, 69 P.3d 126, 131 (2003):

> The party challenging a statute on constitutional grounds bears the burden of establishing that the statute is unconstitutional and 'must overcome a strong presumption of validity.' Appellate courts are obligated to seek an interpretation of a statute that upholds its constitutionality.

(Citations omitted).

As we explained in *State v. Hosey*, 134 Idaho 883, 886, 11 P.3d 1101, 1104 (2000):

> A plea agreement is contractual in nature and must be measured by contract law standards. The interpretation of a contract's meaning and legal effect are questions of law to be decided by the Court if the terms of the contract are clear and unambiguous. The meaning of an unambiguous contract must be determined from the plain meaning of the contract's own words. Where a contract is determined to be ambiguous, interpretation of the contract is a question of fact that focuses on the intent of the parties. Whether the facts establish a violation of the contract is a question of law over which this Court exercises free review.

(Citations omitted).

## III. ANALYSIS

**A. All issues Manzanares raises concerning the Firearm Charge are moot, because the Firearm Charge was dismissed.**

Manzanares pled guilty to the Recruiting Charge in exchange for the dismissal of the Firearm Charge. The second issue Manzanares raises on appeal challenges the constitutionality of the Firearm Provision, and the fourth and fifth issues she raises on appeal, which challenge the information and the sufficiency of the evidence at the preliminary hearing, contain sub-issues

---

[4] *See North Carolina v. Alford*, 400 U.S. 25 (1970). Pursuant to an *Alford* plea, the defendant pleads guilty but refuses to admit to the commission of the acts constituting the crime. *State v. Dopp*, 124 Idaho 481, 485, n.1, 861 P.2d 51, 55, n.1 (1993).

7

specifically concerning the Firearm Charge. The State argues that these issues are moot, because the Firearm Charge was dismissed pursuant to the plea agreement. Manzanares argues that the claims are not moot, because if this Court holds in favor of Manzanares on one of the issues related to the Recruiting Charge, I.C.R. 11(a)(2) affords Manzanares the right to withdraw her guilty plea, in which case the State would be able to re-file the Firearm Charge.

Under the mootness doctrine:

> This Court may dismiss an appeal when it appears that the case involves only a moot question. A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. A case is moot if it presents no justiciable controversy and a judicial determination will have no practical effect upon the outcome.

*Goodson v. Nez Perce Cnty. Bd. of Cnty. Comm'rs*, 133 Idaho 851, 853, 993 P.2d 614, 616 (2000) (citations omitted).

Manzanares is correct that if we were to rule in her favor on the Recruiting Charge, she would be permitted to withdraw her guilty plea pursuant to I.C.R. 11(a)(2), and the State would be able to re-file the Firearm Charge. Under such circumstances, if we were to address the constitutionality of the Firearm Provision on this appeal, our ruling could affect the State's decision to re-file the Firearm Charge and could affect any resulting case. However, ruling on the Firearm Charge issues has no practical effect on *this appeal* and would be an impermissible advisory opinion. *See State v. Barclay*, 149 Idaho 6, 9, 232 P.3d 327, 330 (2010) ("In effect, the State is asking this Court to issue an advisory opinion in order to avoid the issue in future cases; an exercise this Court will not undertake."). Thus, we hold that all issues raised by Manzanares which concern the Firearm Charge were rendered moot when the Firearm Charge was dismissed.

Manzanares also argues that she specifically reserved the right to appeal these issues in the conditional plea agreement. However, parties cannot agree to confer jurisdiction on a court. *State v. Urrabazo*, 150 Idaho 158, 163, 244 P.3d 1244, 1249 (2010) ("subject matter jurisdiction can never be waived or consented to"). Thus, even if the conditional plea agreement purports to reserve these issues for appeal, we are nevertheless without jurisdiction to consider these issues.

**B. We cannot reach Manzanares's *ex post facto* argument, because there was no adverse ruling on this issue below which could be reserved for appeal pursuant to I.C.R. 11(a) and because this issue is non-jurisdictional and does not involve fundamental error.**

The third issue Manzanares raises on appeal is whether the Recruiting Charge is an *ex post facto* violation. We explained in *Wheeler v. Idaho Department of Health and Welfare*:

8

> *Ex post facto* laws are prohibited by article I, section 9, clause 3 of the United States Constitution and by article I, section 16 of the Idaho Constitution. The *ex post facto* clauses prevent the enactment of 'any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed . . . .' *Collins v. Youngblood*, 497 U.S. 37, 42, 110 S.Ct. 2715, 2716-17 111 L.Ed.2d 30, 39 (1990) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169-70, 46 S.Ct. 68, 70 L.Ed. 216, 217 (1925)).

147 Idaho 257, 262, 207 P.3d 988, 993 (2009).

The ICGEA became effective on March 24, 2006. 2006 Idaho Sess. Laws, ch. 184, § 1, p. 585. Even though the complaint, as well as each draft of the information, allege that Manzanares recruited a gang member on a date(s) subsequent to the ICGEA's effective date; the specific incident of recruiting which the State focused on at the preliminary hearing concerned a New Year's party on December 31, 2005—nearly three months prior to the ICGEA's effective date. Thus, Manzanares argues that her conviction violates the *ex post facto* clauses of the Idaho and United States constitutions, because the Recruiting Charge to which she pled guilty was based on her conduct at the New Year's party—prior to the enactment of the ICGEA.

"Ordinarily, a plea of guilty, if voluntarily and knowingly made, is conclusive as to the defendant's guilt and waives all non-jurisdictional defects in prior proceedings against the defendant. A defendant may preserve such defects or issues by entering a conditional guilty plea pursuant to I.C.R. 11(a)(2)." *Hosey*, 134 Idaho at 889, 11 P.3d at 1107 (citation and quotation omitted). Thus, Manzanares's *ex post facto* issue is properly before us on appeal only if either: (1) her conditional plea agreement reserved the issue under I.C.R 11(a)(2); or (2) the issue is jurisdictional.

Manzanares's conditional plea agreement states that she reserves her right to appeal "the issue of the constitutionality of the charge and statute, and such other matters that might appear in the record of this action." Pursuant to I.C.R. 11(a)(2):

> With the approval of the court and the consent of the prosecuting attorney, a defendant may enter a conditional plea of guilty reserving in writing the right, on appeal from the judgment, to review *any specified adverse ruling*. If the defendant prevails on appeal, the defendant shall be allowed to withdraw defendant's plea.

(Emphasis added). "Failure to comply with this rule results in a waiver of any issues not properly reserved for appellate review." *State v. Kelchner*, 130 Idaho 37, 39, 936 P.2d 680, 682

(1997).  As Manzanares concedes in her briefing, the *ex post facto* issue was never raised below.  Thus, there was no adverse ruling below addressing this issue which could have been reserved for appeal.  Accordingly, we hold that Manzanares's conditional plea agreement did not reserve the issue for appeal.

Next, we consider whether Manzanares's *ex post facto* issue is jurisdictional.  While personal jurisdiction may be waived, subject matter jurisdiction cannot be waived and "may be raised at any time, including for the first time on appeal." *State v. Rogers*, 140 Idaho 223, 227, 91 P.3d 1127, 1131 (2004).  "In a criminal case, the court properly acquires *personal jurisdiction* over the defendant when the defendant appears at the initial court setting on a complaint or arraignment on the indictment." *Id.* at 228, 91 P.3d 1132 (emphasis added).  "The information, indictment, or complaint alleging an offense was committed within the State of Idaho confers *subject matter jurisdiction* upon the court." *Id.* (emphasis added).  Manzanares does not argue that the information fails to confer jurisdiction.   She acknowledges that the Complaint, Information, Amended Information and Second Amended Information all allege that Manzanares recruited a gang member in violation of I.C. § 18-8504(1)(a) in Canyon County, Idaho, on a date(s) subsequent to the enactment of the ICGEA.  Thus, we hold that Manzanares's *ex post facto* issue is not jurisdictional and was, therefore, waived by pleading guilty.

Finally, Manzanares also argues that the *ex post facto* issue is properly before this Court because it involves fundamental error.  "As a general rule, we will not consider arguments made for the first time on appeal.  When the alleged error constitutes a fundamental error, however, review on appeal is permissible." *State v. Severson*, 147 Idaho 694, 715–16, 215 P.3d 414, 435–36 (2009) (citations omitted).   However, "we permit a defendant to waive a right of constitutional magnitude, so long as the defendant does so knowingly, voluntarily, and intelligently." *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010).  Manzanares makes no attack on the validity of the conditional plea agreement.  Thus, she waived the *ex post facto* issue by knowingly, voluntarily, and intelligently entering into the plea agreement.

Furthermore, even if Manzanares had not waived this issue, she failed to meet her burden of persuading the appellate court that the alleged error violates a constitutional right.   If Manzanares's conviction under the Recruiting Statute was based on the incident which took place at the New Year's party, then the *ex post facto* clauses of the United States Constitution and the Idaho Constitution would be implicated, since the conduct forming the basis of her

conviction would have taken place prior to the ICGEA's effective date. However, in this case, we do not know what conduct formed the basis of Manzanares's conviction. Manzanares entered an *Alford* plea and, thus, did not admit to any conduct that could form the basis of her guilty plea. *See infra* Part III.C.ii.a. At the preliminary hearing, the State's evidence that Manzanares recruited Trinidad was not limited to the New Year's incident. The State also put forth evidence of an audio recording of Manzanares's voice posted online encouraging listeners to take part in the East Side Locas gang activities, which Trinidad testified to having listened to, and testimony that Manzanares encouraged members of the East Side Locas to go tagging. The magistrate judge relied on this evidence as well as the evidence concerning the New Year's party when he found probable cause to bind her over. Therefore, despite being labeled as an "*ex post facto*" issue, and despite Manzanares's claim on appeal that she pled guilty based on her conduct at the New Year's party, we have no way of knowing from the record what conduct serves as the basis of Manzanares's conviction. Accordingly, we hold that Manzanares has not met the burden of showing a clear error that violated one of her unwaived constitutional rights.

## C. Idaho Code § 18-8504(1)(a) (the Recruiting Provision) is not facially overbroad nor as-applied unconstitutional for prohibiting conduct protected by the First Amendment.

Manzanares argues that the Recruiting Provision is both facially and as applied unconstitutional for penalizing her First Amendment rights to free association and free expression. We hold that the Recruiting Provision is not facially overbroad because it does not prohibit a substantial amount of protected conduct, and we hold that Manzanares has not shown that it is as applied unconstitutional because, due to the circumstances of this case, she is unable to demonstrate what conduct on her part provides the basis of her conviction.

i.   Reservation for appeal pursuant to I.C.R. 11(a)(2).

While we find that Manzanares's conditional plea agreement reserved the facial and as applied challenges for appeal, we take the time to emphasize the proper means of reserving issues for appeal pursuant to I.C.R. 11(a)(2).

A conditional plea agreement should explicitly set forth the adverse ruling(s) below which is being reserved for appeal. Idaho Criminal Rule 11(a)(2) permits a defendant to reserve for appeal any "*specified* adverse ruling" when entering into a conditional plea agreement. (Emphasis added). *See also State v. McCormack*, 117 Idaho 1009, 1010, 793 P.2d 682, 683 (1990) ("I.C.R. 11(a)(2) clearly requires that any issued desired to be reserved for appeal must be specified in writing."). That said, where a conditional plea agreement itself lacks such

11

specificity, Idaho appellate courts will review the record in an attempt to determine what the conditional plea agreement reserves for appeal. *See, e.g., State v. Anderson*, 129 Idaho 763, 764, 932 P.2d 886, 887 (1997), ("This Court will sustain an appeal under Rule 11(a)(2) if we can determine the nature of the appeal and the right reserved for the appeal with specificity from the record."). However, we emphasize that the best practice is to explicitly set forth the adverse rulings which are being reserved for appeal in the conditional plea agreement. If the agreement lacks such specificity, there is a risk that the appellate court will be unable to determine from the record what the parties sought to reserve for appeal.

Manzanares's conditional plea agreement broadly purports to reserve the right to appeal: (1) "the issue of the constitutionality of the charge and statute" and (2) "such other matters that might appear in the record of this action." The broad reservation of "matters that might appear in the record of this action" does not explicitly set forth any adverse ruling(s), but apparently seeks to reserve for appeal any adverse ruling from the prior proceedings. While narrower, the language "the issue of the constitutionality of the charge and statute" also fails to explicitly refer to any adverse ruling below.

Upon review of the record, we are able to ascertain that the language "the issue of the constitutionality of the charge and statute" refers to the adverse ruling on the constitutionality of the Recruiting Statute from district court's August 7, 2007 Order. At the plea hearing, Manzanares's attorney stated: "The part of the plea agreement that I suppose is most critical at this point is the fact that my client reserves the right to appeal the matter to the Supreme Court testing the statute under which she's pleading guilty this morning." And, Manzanares answered in the affirmative to the following question asked by the district court at the plea hearing: "[Y]ou have agreed to plead guilty, but that you're reserving your right to appeal the constitutionality of that statute?" From these statements at the plea hearing, it is clear that Manzanares sought to reserve the right to challenge the constitutionality of the statute to which she pled guilty—the Recruiting Statute. Manzanares's June 12, 2007 Motion to Dismiss asserted, amongst other arguments, that the Recruiting Statute is overbroad, and in its August 7, 2007 Order, the district court denied Manzanares's motion to dismiss as to the overbreadth challenge. Thus, we find that

Manzanares reserved the right to appeal the district court's ruling that the Recruiting Statute is not overbroad.[5]

    ii.    <u>Constitutional challenges to the Recruiting Provision.</u>

Manzanares argues that the Recruiting Provision (I.C. § 18-8504(1)(a)) is unconstitutionally overbroad for criminalizing association, speech, and expressive conduct in violation of the First Amendment of the United States Constitution and Article I, sections 9 and 10 of the Idaho Constitution. According to Manzanares, by not requiring the State to prove that the defendant recruited the gang member with the specific intent to further the criminal activities of the gang, the Recruiting Provision generally criminalizes too much constitutionally protected conduct to be facially valid and, as applied to the particulars of this case, criminalizes Manzanares's exercise of protected conduct.

The Recruiting Provision provides that a person commits the offense of recruiting a criminal gang member by "[k]nowingly soliciting, inviting, encouraging or otherwise causing a person to actively participate in a criminal gang."[6] The ICGEA defines "Criminal gang" as:

> an ongoing organization, association, or group of three (3) or more persons, whether formal or informal, that has a common name or common identifying sign or symbol, whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity, having as one (1) of its primary activities the commission of one (1) or more of the criminal acts enumerated in subsection (3) of this section.

Idaho Code § 18-8502(1). "Pattern of criminal gang activity" is defined in the ICGEA as "the commission, attempted commission, or solicitation of two (2) or more [enumerated offenses], provided that the offenses are committed on separate occasions or by two (2) or more gang members". Idaho Code § 18-8502(3).

---

[5] Note, even if Manzanares had failed to reserve the district court's ruling on the overbreadth of the Recruiting Statute, her facial overbreadth challenge is a jurisdictional issue which can be raised on appeal. However, her as applied challenge is not jurisdictional and would be waived. In *State v. Trochinski*, 644 N.W.2d 891, 904, n.15 (2002), the Wisconsin Supreme Court explained:

> Trochinski has waived his right to challenge Wis. Stat. § 948.11(2) as applied, because of his plea. *State v. Molitor*, 210 Wis.2d 415, 419, 565 N.W.2d 248 (Ct.App.1997). "A plea of no contest waives all non-jurisdictional defects in the proceedings." *Id.* (citing *State v. Princess Cinema of Milwaukee, Inc.* 96 Wis.2d 646, 651, 292 N.W.2d 807 (1980)). In contrast, a facial challenge to the constitutionality of a statute is a matter of subject matter jurisdiction and cannot be waived. *Molitor*, 210 Wis.2d 415 at 419, 565 N.W.2d 248; *State ex rel. Skinkis v. Treffert*, 90 Wis.2d 528, 538-539, 280 N.W.2d 316 (Ct.App.1979).

[6] Idaho Code § 18-8504(1)(b) provides an alternative way of committing the crime of recruiting a criminal gang member. Part (b) is not at issue in this case, and this opinion does not address that provision.

Putting the pieces of the ICGEA together, in order to convict a defendant under the Recruiting Provision, the State bears a difficult burden. Preliminarily, the State must establish that there is a gang by proving (1) there is an ongoing organization, group or association (2) with a common name or sign (3) consisting of at least three members. Next, the State must prove that the gang is a "criminal gang". The ICGEA sets forth two criteria that must be met to show that a gang is a criminal gang. First, the State must prove that (4) members of the gang (5) individually or collectively committed, attempted to commit, or solicited *at least two* of the ICGEA's enumerated offenses and that (6) the two enumerated offenses were committed either on separate occasions or by two or more gang members. Second, the State must prove that (7) the commission of one or more of the ICGEA's enumerated criminal offenses is one of the gang's "primary activities".

In addition to establishing the existence of a "criminal gang," the State must prove that the defendant *knowingly* solicited, invited, encouraged, or otherwise caused a person to "actively participate in the criminal gang." Under Idaho's criminal code: "The word 'knowingly,' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code. It does not require any knowledge of the unlawfulness of such act or omission." I.C. § 18-101(5). Since "criminal gang" is a defined term under the ICGEA (I.C. § 18-8502(1)), in order to "actively participate in a criminal gang," a person must actively participate in those activities that bring the organization into the ICGEA's definition of "criminal gang." Thus, putting these pieces together, after the State proves the existence of a criminal gang (as set forth in the preceding paragraph), the State must prove that the defendant (1) knew of the criminal gang and (2) knowingly solicited, invited, encouraged, or otherwise caused someone to "actively participate in" either (a) the criminal gang's commission of one of the ICGEA's enumerated offenses or (b) in making it one of the criminal gang's "primary activities" to commit one or more of the ICGEA's enumerated crimes.

### a. *Facial challenge.*

Manzanares argues that the Recruiting Provision overbroadly criminalizes association, speech and expressive conduct in violation of the First Amendment of the United States Constitution and Article I, sections 9 and 10 of the Idaho Constitution. We find that the Recruiting Provision does not prohibit a significant amount of protected conduct and, therefore, is not unconstitutionally overbroad.

14

"The overbreadth doctrine is aimed at statutes which, though designed to prohibit legitimately regulated conduct, include within their prohibitions constitutionally protected freedoms." *Korsen*, 138 Idaho at 713, 69 P.3d at 133. The two-part test for unconstitutional overbreadth asks (1) whether the statute regulates constitutionally protected conduct, and (2) whether the statute precludes a significant amount of that constitutionally protected conduct. *Id.* If the answer to both steps is in the affirmative, then the statute is overbroad. *See id.* "A statute that is found to be overbroad may not be enforced at all, even against speech or conduct that could constitutionally be prohibited by a more narrowly drawn statute." *Id.* at 714, 69 P.3d 134. "Only if the statute intrudes upon a *substantial amount* of constitutionally protected conduct may it be struck down for overbreadth." *Id.* (emphasis added) (quotation omitted). "[A] statute will not be invalidated for overbreadth merely because it is possible to imagine some unconstitutional applications. Rather, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* (quotation and citation omitted).

The First Amendment of the United States Constitution, which guarantees the right to free expression, peaceable assembly and seeking redress with our government, applies to the states through the Fourteenth Amendment. *Elfbrandt v. Russell*, 384 U.S. 11, 18 (1966). While not explicitly stated in the First Amendment, the First Amendment guarantees individuals the right to free association. *Healy v. James*, 408 U.S. 169, 181 (1972). "The right to associate for expressive purposes is not, however, absolute." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). "The freedom of association protected by the First Amendment does not extend to joining with others for the purpose of depriving third parties of their lawful rights." *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 776 (1994). However, "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982).

First, we find that the Recruiting Provision, as a law which criminalizes the recruitment of members into an organization, implicates the First Amendment right to free association, even though the organizations at issue are involved in criminal activity. Thus, we turn to the second step of the overbreadth analysis and ask whether the Recruiting Provision precludes a significant amount of that constitutionally protected conduct.

Manzanares draws our attention to a line of cases in which the United States Supreme Court considered statutes which placed certain penalties or restrictions on members of the Communist Party: *Scales v. United States*, 367 U.S. 203 (1961); *Noto v. United States*, 367 U.S. 290 (1961); *Aptheker v. Secretary of State*, 378 U.S. 500 (1964); and *Elfbrandt*, 384 U.S. 11. Based on this line of cases, Manzanares argues that joining an organization can be criminalized only if the statute requires proof that the defendant had the specific intent to further the organization's criminal enterprise. We do not read these cases to set forth such a blanket rule.

In *Elfbrandt*, the Supreme Court relied on *Scales*, *Noto,* and *Aptheker* to invalidate a state law subjecting teachers to criminal punishment for being members of the Communist Party or any other organization advocating for the violent overthrow of the government, stating: "Any lingering doubt that proscription of mere knowing membership, without any showing of 'specific intent,' would run afoul of the Constitution was set at rest by our decision in *Aptheker . . . .*" 384 U.S. at 16. The Supreme Court noted that the statute at issue did not include a specific intent requirement, and the Supreme Court stated:

> One who subscribes to this Arizona oath and who is, or thereafter becomes, a knowing member of an organization which has as 'one of its purposes' the violent overthrow of the government, is subject to immediate discharge and criminal penalties. Nothing in the oath, the statutory gloss, or the construction of the oath and statutes given by the Arizona Supreme Court, purports to exclude association by one who does not subscribe to the organization's unlawful ends.

*Id.* The Supreme Court went on to explain:

> Those who join an organization but do not share its unlawful purposes and who do not participate in its unlawful activities surely pose no threat, either as citizens or as public employees. Laws such as this which are not restricted in scope to those who join with the 'specific intent' to further illegal action impose, in effect, a conclusive presumption that the member shares the unlawful aims of the organization.

*Id.* at 17.

This line of cases generally sets forth that a statute is overbroad if it criminalizes conduct like merely joining, membership in or participation in an organization (even if that organization engages in criminal activity) without distinguishing people who do not share the goals of the organization's unlawful purposes and do not participate in its unlawful activities. And these cases set forth that a requirement of specific intent to further the criminal activity of the organization sufficiently narrows the statutes at issue in those cases. However, those cases do not foreclose the possibility that there are other ways in which a statute might be drafted

16

narrowly enough to survive an overbreadth challenge. Thus, even though the Recruiting Provision does not contain a specific intent requirement, we must still look to the language of the Recruiting Provision to determine whether it precludes a substantial amount of protected conduct.

In focusing on the lack of a specific intent requirement, Manzanares simply overlooks what the Recruiting Provision does require the State to prove: that the defendant knew of the existence of the criminal gang and that the defendant knowingly solicited, invited, encouraged or otherwise caused a person to actively participate in either the criminal gang's commission of one of the ICGEA's enumerated offenses or in making the commission of one of those crimes one of the primary activities of the criminal gang. While knowledge is a different mens rea than specific intent, we find that the Recruiting Provision is sufficiently narrow to avoid implicating a substantial amount of protected conduct.

Merely soliciting, inviting, encouraging, or otherwise causing a person to be a member of an organization or to associate or interact with that organization, even where that organization qualifies as a criminal gang under the ICGEA, does not necessarily amount to soliciting, inviting, encouraging, or otherwise causing that person to "actively participate in a criminal gang" under the Recruiting Provision. For example, if a defendant knowingly invites a person to merely attend a lawful political rally or religious event organized and hosted by a group that the defendant knows to be a criminal gang, the defendant has not knowingly invited a person to actively participate in the criminal gang's commission of any of the offenses enumerated in the ICGEA and, thus, has not recruited that person as a gang member pursuant to I.C. § 18-8504(1)(a). However, where a defendant knowingly invites a person to somehow promote, further or assist in the commission of the ICGEA's enumerated offenses by any member of the criminal gang, then the defendant has invited a person to actively participate in the criminal gang.

The State relies heavily on *Holder v. Humanitarian Law Project*, in which the United States Supreme Court recently upheld 18 U.S.C. § 2339B(a)(1), which makes it a crime to "knowingly provid[e] material support or resources to a foreign terrorist organization." 130 S.Ct. 2705, 2712 (2010) (alteration in original). The term "material support or resources" is defined by statute as:

any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339B(a)(1). The Secretary of State has the authority, in consultation with the Secretary of the Treasury and the Attorney General, to designate an entity a "foreign terrorist organization" pursuant to statute upon finding that the organization is foreign, engages in terrorist activity or terrorism, and thereby threatens the security of United States nationals or the national security of the United States. *See Holder*, 130 S.Ct. at 2713. In *Holder*, the plaintiffs challenged the prohibition on four types of material support: training; expert advice or assistance; service; and personnel. *Id.* at 2716.

Manzanares points out unique characteristics of the *Holder* decision, which indicate that *Holder* may have limited applicability: the Supreme Court noted that the war on terror is a uniquely compelling government objective; the Supreme Court emphasized the legislative findings linking the provision of material support to foreign terrorist organizations with terrorist activity; and the statute at issue applied only to *foreign* terrorist organizations. Despite these differences, we find that *Holder* is instructive in its general analysis of an overbreadth challenge. In *Holder*, the plaintiffs argued that the statute violated their freedom of association under the First Amendment by criminalizing the mere fact of their associating with two designated foreign terrorist organizations. *Id.* at 2730. The Court dismissed this argument, explaining: "The statute does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group. . . . What [the statute] prohibits is the act of giving material support." *Id.*

In *Holder*, the Supreme Court relied on its decision in *United States v. Robel*, which considered an overbreadth challenge to section 5(a)(1)(D) of the Subversive Activities Control Act of 1950, "which provides that, when a Communist-action organization is under a final order to register, it shall be unlawful for any member of the organization 'to engage in any employment in any defense facility.'" 389 U.S. 258, 260 (1967). In *Robel*, the Supreme Court held that the statute was overbroad and explained: "It is precisely because th[e] statute sweeps indiscriminately across all types of association with Communist-action groups, without regard to the quality and degree of membership, that it runs afoul of the First Amendment." *Id.* at 262.

Turning to the case at hand, we do *not* find that the Recruiting Provision sweeps indiscriminately across all types of association with criminal gangs and without regard to the quality and degree of membership such that it runs afoul of the First Amendment.

Similarly to the plaintiffs in *Holder*, Manzanares argues that the Recruiting Provision is overbroad in violation of her First Amendment right to free association by criminalizing her mere association with, or her causing of other persons association with, criminal gangs. However, we find that the Recruiting Provision does *not* criminalize joining, or advocating for the lawful goals of, an organization that happens to be a criminal gang under the ICGEA. While there may be imaginable instances in which I.C. § 18-8504(1)(a) penalizes conduct protected under the First Amendment, we find that the statute does not implicate a substantial amount of constitutionally protected conduct. Should such imaginable instances arise, the as-applied challenge is available to protect the defendant's constitutional rights. Therefore, we hold that the Recruiting Provision is not facially overbroad.

b. *As applied challenge.*

Manzanares argues that the Recruiting Provision is unconstitutional as applied to her for infringing on her right to association and expression, because the district court concluded that she could be brought to trial based on the mere fact that she participated in Trinidad's initiation into the East Side Locas without any evidence that she did so with the specific intent to further the allegedly illegal activities of the gang.

"To prove a statute is unconstitutional 'as applied,' the party challenging the constitutionality of the statute must demonstrate that the statute, as applied to the defendant's conduct, is unconstitutional." *State v. Cook*, 146 Idaho 261, 262, 192 P.3d 1085, 1086 (Ct. App. 2008) (citing *Korsen*, 138 Idaho at 712, 69 P.3d at 132). "If a statute as applied to a particular defendant infringes upon his or her freedom of speech protected by the First Amendment, the defendant's conviction must be reversed without any showing that such infringement was 'substantial.'" *State v. Poe*, 139 Idaho 885, 893, 88 P.3d 704, 712 (2004) (citing *Cohen v. California*, 403 U.S. 15 (1971)).

Manzanares failed to show that the Recruiting Provision is unconstitutional as applied to her conduct, because she cannot point to the conduct of hers which serves as the basis of her conviction. In *Cook*, the Court of Appeals noted that "an as-applied constitutional challenge is based on the particular facts of a defendant's case and it is often difficult to ascertain what those

19

facts are without the benefit of a trial." 146 Idaho at 263, 192 P.3d at 1087. We agree, and we find that this is particularly true when, as is the case here: (1) the information does not refer to specific conduct of the defendant; (2) the preliminary hearing provides little factual specificity and sets forth more than one course of conduct which could serve as the basis for the charge; and (3) where the defendant enters an *Alford* plea.

First, the information does not set forth the specific conduct by which Manzanares allegedly recruited Trinidad—it merely provides that Manzanares "on or about the 1st day of April, 2006, to the 26th day of February, 2007, in the County of Canyon, State of Idaho, did knowingly solicit, invite, encourage or otherwise cause a person, Jackie Trinidad, to actively participate in a criminal gang, The East Side Locas."

Second, while the evidence presented at the preliminary hearing sheds some light on the State's basis for charging Manzanares under the Recruiting Provision, the preliminary hearing provides little factual specificity on a number of the elements that the State would have had to prove to convict her under I.C. § 18-8504(1)(a). As already explained *supra* at Part III.B, while Manzanares claims on appeal that she pled guilty based on her alleged participation in jumping Trinidad into the East Side Locas at the New Year's party, the State put forth additional evidence concerning Manzanares's website and her requests for members of East Side Locas to go tagging as well as her knowledge of the East Side Locas' criminal activity.

Third, by entering an *Alford* plea, Manzanares did not admit to any conduct on her part which related to the charge. She made no admissions during the plea colloquy as to any conduct she engaged in that violates the Recruiting Provision. Thus, we cannot ascertain how the Recruiting Provision was applied to Manzanares. Accordingly, we hold that she failed to show that the Recruiting Provision was applied to her in a manner that infringed upon her First Amendment rights.

**D. In light of our decision, the two remaining issues raised by Manzanares need not be addressed.**

Manzanares's remaining two issues on appeal are whether the district court erred in failing to dismiss the information on the bases that (1) the information failed to enumerate all of the elements of the offense charged and (2) insufficient evidence was presented at the preliminary hearing. Both of these claims, as Manzanares explains in her briefing, are contingent upon this Court reading into the Recruiting Provision an element of specific intent on the defendant's behalf to further the criminal gang's illegal activities. We have not read such an

element into the Recruiting Provision (*supra* Part III.C.ii.b), and accordingly, we need not reach these issues.

## IV. CONCLUSION

We uphold Manzanares's conviction pursuant to her conditional plea agreement. Idaho Code § 18-8504(1)(a) (ICGEA's Recruiting Provision) is not unconstitutionally overbroad, because the statute, as drafted by the legislature, does not infringe upon a substantial amount of conduct protected by the First Amendment. Manzanares failed to show that the Recruiting Provision was unconstitutional as applied to her.

Justices EISMANN, J. JONES and W. JONES, **CONCUR.**


HORTON, J., specially concurring in part and dissenting in part.

I join in the result reached in Parts III.A and III.D of the Court's opinion, although for different reasons than the majority. I join in the Court's opinion as to Parts III.B and III.C.i. I respectfully dissent from Part III.C.ii of the Court's opinion.

**I. Part III.A – The Reviewability of Manzanares' Challenges to the Firearm Charge**

I join in the Court's decision that we may not reach Manzanares' challenges to the Firearm Charge. I do so because the issues advanced on appeal relating to the Firearm Charge were not preserved for appeal. The written plea agreement which identifies the issue or issues preserved for appeal states: "The Defendant reserves the right to appeal to the Idaho Supreme Court the issue of the constitutionality of the charge and statute, and such other matters that might appear in the record of this action." In my view, the use of the singular "the charge" is inconsistent with the reservation to appeal "such other matters that might appear in the record," creating ambiguity as to the scope of matters which were preserved for appeal.

The majority correctly notes that *State v. Hosey*, 134 Idaho 883, 886, 11 P.3d 1101, 1104 (2000), holds that interpretation of the terms of an ambiguous plea agreement involves questions of fact. I believe that Manzanares' attorney's explanation of the term at the time of the entry of her plea resolves the ambiguity. He stated: "The part of the plea agreement that I suppose is most critical at this point is the fact that my client reserves the right to appeal the matter to the Supreme Court testing the statute under which she's pleading guilty this morning." Thus, it is clear to me that Manzanares' conditional plea of guilty only served to preserve her constitutional challenge to the Recruiting Provision. Although I question the wisdom of a conditional plea of

21

guilty that does not take into account the possibility of success on appeal (with the consequent probability of a second appeal), I may not substitute my view of what may have been desirable for the parties' express agreement. Given that counsel's explanation clearly reflected the understanding that Manzanares would be permitted to challenge the charge to which she pleaded guilty, I concur with the Court's determination that it is inappropriate to address her challenges to the Firearm Charge.

## II. Part III.C.ii – The Constitutionality of the Recruiting Provision

I respectfully dissent from the Court's conclusion that the Recruiting Provision is not facially overbroad.

## A. Structure of the ICGEA

I start first with consideration of the Court's description of the operation of the ICGEA. I do so because I believe that the Court's description, although resulting in a construction which avoids the necessity of declaring the statute unconstitutional, is not found within the language of the act and is inconsistent with the evident intent of the Legislature.

After discussing the Recruiting Provision and three statutory definitions, the Court concludes:

> Thus, putting these pieces together, after the State proves the existence of a criminal gang . . . , the State must prove that the defendant (1) knew of the criminal gang and (2) knowingly solicited, invited, encouraged, or otherwise caused someone to *"actively participate in" either (a) the criminal gang's commission of one of the ICGEA's enumerated offenses or (b) in making it one of the criminal gang's "primary activities" to commit one or more of the ICGEA's enumerated crimes.*

(Emphasis added). This description of the Recruiting Provision as requiring that the defendant "caused someone" to "actively participate" by either (1) committing one of the ICGEA's enumerated offenses or (2) by "making it one of the criminal gang's 'primary activities' to commit one or more" of those offenses is critical to the Court's holding in this case. Indeed, when concluding that the Recruiting Provision passes constitutional muster, the Court states:

> In focusing on the lack of a specific intent requirement, Manzanares simply overlooks what the Recruiting Provision does require the State to prove: *that the defendant knew of the existence of the criminal gang and that the defendant knowingly solicited, invited, encouraged or otherwise caused a person to actively participate in either the criminal gang's commission of one of the ICGEA's enumerated offenses or in making the commission of one of those crimes one of the primary activities of the criminal gang.* While knowledge is a different

22

mens rea than specific intent, we find that the Recruiting Provision is sufficiently narrow to avoid implicating a substantial amount of protected conduct.

> Merely soliciting, inviting, encouraging or otherwise causing a person to be a member of an organization or to associate or interact with that organization, even where that organization qualifies as a criminal gang under the ICGEA, does not necessarily amount to soliciting, inviting, encouraging or otherwise causing that person to "actively participate in a criminal gang" under the Recruiting Provision. . . . However, where a defendant knowingly invites a person to somehow promote, further or assist in the commission of the ICGEA's enumerated offenses by any member of the criminal gang, then the defendant has invited a person to actively participate in the criminal gang.

Unlike the majority, I am unable to discern the link between the phrase "actively participate" and criminal activity in the statutory scheme.

Idaho Code § 18-8504(1)[7] provides, in pertinent part, that "[a] person commits the offense of recruiting criminal gang members by: (a) Knowingly soliciting, inviting, encouraging or otherwise causing a person to actively participate in a criminal gang." Significantly, the statute does not require that the accused cause another to become a "criminal gang member." This phrase has a specific statutory definition,[8] specifying that in order to be a "criminal gang member," one must engage in "a pattern of criminal gang activity" in addition to meeting certain other criteria. A "pattern of criminal gang activity" is defined by I.C. § 18-8502(3)[9] as "the

---

[7] In this dissent, all citations to, and quotations from, the ICGEA refer to the statutes in effect at the time of Manzanares' plea of guilty. The act was amended earlier this year. 2011 Idaho Sess. Laws ch. 188, 538-40.

[8] Idaho Code § 18-8502(2) defines a "criminal gang member" as:
. . . any person who engages in a pattern of criminal gang activity and who meets two (2) or more of the following criteria:
    (a) Admits to gang membership;
    (b) Is identified as a gang member;
    (c) Resides in or frequents a particular gang's area and adopts its style of dress, its use of hand signs, or its tattoos, and associates with known gang members;
    (d) Has been arrested more than once in the company of identified gang members for offenses that are consistent with usual gang activity;
    (e) Is identified as a gang member by physical evidence such as photographs or other documentation; or
    (f) Has been stopped in the company of known gang members four (4) or more times.

[9] Idaho Code § 18-8502(3) states:
"Pattern of criminal gang activity" means the commission, attempted commission or solicitation of two (2) or more of the following offenses, provided that the offenses are committed on separate occasions or by two (2) or more gang members:
    (a) Robbery, as provided in section 18-6501, Idaho Code;
    (b) Arson, as provided in sections 18-801 through 18-804, Idaho Code;
    (c) Burglary, as provided in sections 18-1401, 18-1403, 18-1405 and 18-1406, Idaho Code;
    (d) Murder or manslaughter, as provided, respectively, in sections 18-4001 and 18-4006, Idaho Code;
    (e) Any violation of the provisions of chapter 27, title 37, Idaho Code, that involves possession with intent to deliver, distribution, delivery or manufacturing of a substance prohibited therein;

commission, attempted commission or solicitation of two (2) or more of [twenty-one specified predicate] offenses, provided that the offenses are committed on separate occasions or by two (2) or more gang members." Thus, a prerequisite to being a "criminal gang member" is the solicitation, attempted commission, or commission of two or more of the crimes listed in I.C. § 18-8502(3) ("predicate offenses").

The majority evidently shares my view that the Recruiting Provision does not require that the accused cause another (the "recruit") to become a criminal gang member. Rather, the majority describes the Recruiting Provision as requiring that the recruit "actively participate" in either: (1) the criminal gang's commission of a predicate offense; or (2) making commission of a predicate offense one of the criminal gang's "primary activities." However, the statutory definition of "criminal gang" does not provide for such a narrow construction of the Recruiting Provision. Idaho Code § 18-8502(1) defines a "criminal gang" as:

> . . . an ongoing organization, association, or group of three (3) or more persons, whether formal or informal, that has a common name or common identifying sign or symbol, whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity, having as one (1) of its primary activities the commission of one (1) or more of the criminal acts enumerated in subsection (3) of this section.

Parsing this definition, a criminal gang is: (1) an ongoing organization, association, or group of three or more persons, whether formal or informal, (2) that has a common name or common identifying sign or symbol, (3) whose members individually or collectively engage in or have

---

(f) Any unlawful use of a weapon that is a felony pursuant to chapter 33, title 18, Idaho Code;
(g) Assault and battery, as provided in chapter 9, title 18, Idaho Code;
(h) Criminal solicitation, as provided in section 18-2001, Idaho Code;
(i) Computer crime, as provided in section 18-2202, Idaho Code;
(j) Theft, as provided in sections 18-2401 and 18-2403, Idaho Code;
(k) Evidence falsified or concealed and witnesses intimidated or bribed, as provided in sections 18-2601 through 18-2606, Idaho Code;
(l) Forgery and counterfeiting, as provided in sections 18-3601 through 18-3603 and sections 18-3605 through 18-3616, Idaho Code;
(m) Gambling, as provided in section 18-3802, Idaho Code;
(n) Kidnapping, as provided in sections 18-4501 through 18-4503, Idaho Code;
(o) Mayhem, as provided in section 18-5001, Idaho Code;
(p) Prostitution, as provided in sections 18-5601 through 18-5614, Idaho Code;
(q) Rape, as provided in sections 18-6101, 18-6108 and 18-6110, Idaho Code;
(r) Racketeering, as provided in section 18-7804, Idaho Code;
(s) Malicious harassment, as provided in section 18-7902, Idaho Code.
(t) Terrorism, as provided in section 18-8103, Idaho Code;
(u) Money laundering and illegal investment, as provided in section 18-8201, Idaho Code.

engaged in a pattern of criminal gang activity, (4) having as one of its primary activities the commission of one or more predicate offenses.

Presumably, the fourth clause is intended to distinguish a criminal gang from non-criminal associations of three or more persons that have a common name or common identifying sign. If this were not the case, any service organization (*e.g.*, Rotary), religious organization, public institution (including those whose members identify themselves as senators, representatives, commissioners, judges, etc.), or any other association with an identifiable membership could be characterized as a "criminal gang" if a member or members of that association "individually or collectively engage in or have engaged in a pattern of criminal gang activity."

The importance of the fourth clause cannot be gainsaid. I think that the implications of its absence are perhaps best demonstrated by way of an example. Rotary International is an organization comprised of 1.2 million members in more than 34,000 clubs worldwide. Identifying themselves as "Rotarians," they "provide humanitarian service, encourage high ethical standards in all vocations, and help build goodwill and peace in the world."[10] In the absence of the fourth clause, if a single Rotarian committed two acts of assault on different occasions (assault is a predicate offense under I.C. § 18-8502(3)(g)), Rotary International would properly be characterized as a "criminal gang" and, by operation of the Recruiting Provision, one would commit a felony by soliciting another to "actively participate" in the work of Rotary International.

Thus, I turn my attention to the language of the fourth clause, i.e., "having as one (1) of its primary activities the commission of one (1) or more of the criminal acts enumerated in [I.C. § 18-8502(3)]." The indefinite possessive pronoun "its" evidently refers to the association. Two difficulties with this fourth clause present themselves to me.

The first difficulty that I confront is this: regardless of the noun considered, whether it be "organization," "association," or "group," the noun identifies a relationship between individuals, while "primary activities" relates to the joint or individual actions of one more members sharing that common relationship. This is significant because the concept of relationship is abstract; whereas the commission, attempted commission or solicitation of criminal acts is not. Stated

---

[10] All factual references to the composition of Rotary International and its objectives may be found at http://www.rotary.org/EN/ABOUTUS/Pages/ridefault.aspx.

25

differently, an association does not act.[11]  Rather, the members of an association act, whether individually or in concert.  The definition of criminal gang is notable because it does not require that each person sharing the relationship also share a common objective of engaging in, or encouraging commission of, predicate offenses.

Equally significantly, the ICGEA does not require that the commission of one or more predicate offenses be *the* primary activity of the association.  Rather, the Act merely requires that such criminal conduct be only *one* of the association's primary activities.  Used in this sense, "primary" does not have its most common meaning of "first in importance."  WEBSTER'S NEW WORLD DICTIONARY 1129 (2d college ed. 1976).  Rather, it has the secondary meaning of "chief; principal; main [a *primary* concern]."  *Id*.  Thus under the ICGEA, an association that engages in multiple primary activities, many of which are non-criminal, is a criminal gang if just one of those primary activities is the commission of predicate offenses.  Under the statutory definition, then, one may "actively participate" in a criminal gang – even in a "primary activity" of that gang – without sharing a common criminal objective and without criminal intent.  Since the Recruiting Provision, I.C. § 18-8504(1), merely requires that one knowingly cause "a person to actively participate in a criminal gang," I am unable to agree with the majority's conclusion that the Recruiting Provision requires that the recruit "'actively participate in' either (a) the criminal gang's commission of one of the ICGEA's enumerated offenses or (b) in making it one of the criminal gang's "primary activities" to commit one or more of the ICGEA's enumerated crimes."

I am not alone in this view.  At oral argument, in response to a hypothetical question, the Deputy Attorney General representing the State expressed his belief that the Recruiting Provision could properly be interpreted as prohibiting the recruiting of an interior decorator into gang

---

[11]  As will be discussed more fully in this opinion, the United States Supreme Court has addressed this issue by imposing a requirement that the defendant possess the specific intent to advance criminal aims of the organization:

> The problems in attributing criminal behavior to an abstract entity rather than to specified individuals, though perhaps difficult theoretically, as a practical matter resolve themselves into problems of proof.  Whether it has been successfully shown that a particular group engages in forbidden advocacy must depend on the nature of the organization, the occasions on which such advocacy took place, the frequency of such occasions, and the position within the group of the persons engaging in the advocacy.  Understood in this way, there is no great difference between a charge of being a member in a group which engages in criminal conduct and being a member of a large conspiracy, many of whose participants are unknown or not before the court.  *Whatever difficulties might be thought to inhere in ascribing a course of criminal conduct to an abstract entity are certainly cured, so far as any particular defendant is concerned, by the requirement of proof that he knew that the organization engages in criminal advocacy, and that it was his purpose of* [sic] *further that criminal advocacy.*

*Scales v. United States*, 367 U.S. 203, 226 n. 18 (1961) (citation omitted, emphasis added).

26

membership, even if the role of that recruit was limited to "actively participating" in the gang by designing a more attractive clubhouse where the gang members might socialize. Further, the State's sweeping view of the scope of the Recruiting Provision is well-grounded in legislative history.

Based upon common language found in the two acts, it is evident that the ICGEA was derived, in large part, from California's Street Terrorism Enforcement and Prevention Act (STEP). STEP's recruiting provision states:

> (a) Any person who solicits or recruits another to actively participate in a criminal street gang, as defined in subdivision (f) of Section 186.22, *with the intent* that the person solicited or recruited participate in a pattern of criminal street gang activity, as defined in subdivision (e) of Section 186.22, or *with the intent* that the person solicited or recruited promote, further, or assist in any felonious conduct by members of the criminal street gang, shall be punished by imprisonment in the state prison for 16 months, or two or three years.

Cal. Penal Code § 186.26 (emphasis added). As the emphasized language reflects, STEP expressly provides that a person is guilty of recruiting criminal gang members if he or she did so with the specific intent that the recruit would "participate in a pattern of criminal street gang activity" or that the recruit would "promote, further, or assist in any felonious conduct by members" of the gang. When the Idaho Legislature enacted the ICGEA, its decision to modify the recruiting provision found in the California statute reflected the intent to eliminate the requirement that the defendant possess the specific intent that the recruit would participate in criminal conduct. *Brown's Tie & Lumber Co. v. Chicago Title Co. of Idaho*, 115 Idaho 56, 60, 764 P.2d 423, 427 (1988) (significant that legislature omitted statutory language used in other jurisdictions).

Thus, I turn my attention to the First Amendment implications presented by the absence of a requirement that a defendant possess the specific intent that a recruit will engage in criminal conduct.

### B. First Amendment Considerations

The United States Supreme Court has repeatedly stated that "freedom of association is itself guaranteed in the First Amendment . . . ." *Aptheker v. Sec'y of State*, 378 U.S. 500, 507 (1964) (citations omitted); *see also Healy v. James*, 408 U.S. 169, 181 (1972); *Elfbrandt v. Russell,* 384 U.S. 11, 17 (1966); *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 543 (1963). The Fourteenth Amendment prohibits the states from abridging the freedoms guaranteed

27

by the First Amendment.[12] *Cramp v. Bd. of Public Instruction of Orange Cnty., Fla.*, 368 U.S. 278, 285 (1961); *Cantwell v. State of Conn.*, 310 U.S. 296, 303 (1940).

This, of course, begs the question: What does "freedom of association" mean? Despite the United States Supreme Court's description that the right of association "includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means," *Griswold v. Conn.*, 381 U.S. 479, 483 (1965) (citation omitted), the answer is not entirely clear. The United States Supreme Court did provide instruction in *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537 (1987), and *City of Dallas v. Stanglin*, 490 U.S. 19 (1989).

In *Roberts*, the Court assessed the constitutionality of a Minnesota antidiscrimination statute that required a civic organization to make full membership available to women. 468 U.S. at 612. There, , the Court defined two lines of precedent:

> Our decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of

---

[12] The United States Supreme Court has consistently held that the First Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See*, *e.g.*, *De Jonge v. State of Oregon,* 299 U.S. 353, 364 (1937).

Justice Eismann correctly cites Justice Thomas' concurrence in *McDonald v. City of Chicago, Ill.,* 130 S.Ct. 3020, 3059 (2010), as authority for the proposition that the Privileges and Immunities Clause is the basis upon which the freedoms guaranteed by the Bill of Rights are protected from state action. However, a majority of the United States Supreme Court expressly declined to join in Justice Thomas' opinion on this subject. Justice Alito, joined by Chief Justice Roberts and Justices Scalia and Kennedy, discussed the *Slaughter-House Cases*, 83 U.S. 36 ( (1873), which held that the Privileges or Immunities Clause protects only those rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws." *Id.* at 79. The *McDonald* plurality refused to accept the Petitioners' request that the decision of the *Slaughter-House Cases* be overturned, stating:

> We see no need to reconsider that interpretation here. For many decades, the question of the rights protected by the Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause of that Amendment and not under the Privileges or Immunities Clause. We therefore decline to disturb the *Slaughter-House* holding.

130 S.Ct. at 3030-31.

The plurality was joined by Justice Stevens in his dissent:

> I agree with the plurality's refusal to accept petitioners' primary submission. Their briefs marshal an impressive amount of historical evidence for their argument that the Court interpreted the Privileges or Immunities Clause too narrowly in the *Slaughter-House Cases,* 16 Wall. 36, 21 L.Ed. 394 (1873). But the original meaning of the Clause is not as clear as they suggest - and not nearly as clear as it would need to be to dislodge 137 years of precedent.

*Id.* at 3089 (citations and footnote omitted).

engaging in those activities protected by the First Amendment - speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

*Id*. at 617-18. The Court continued, observing that "the nature and degree of constitutional protection afforded freedom of association may vary depending on the extent to which one or the other aspect of the constitutionally protected liberty is at stake in a given case." *Id*. at 618.

Describing the first category of cases, the Court continued:

The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State. Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State. Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty.

*Id*. at 618-19 (citations omitted).

The Court then noted the continuum of relationships existing in society, ranging from intimate family relationships to co-workers employed by a large corporation, observing that the former are entitled to constitutional protection while suggesting that the latter are not. *Id*. at 619-20. Those relationships clearly entitled to constitutional protections are those possessing the following attributes: "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id*. at 620. Conversely, an association lacking these attributes is not likely to be afforded constitutional protection. *Id*. In determining whether an association is entitled to protection, the Court then identified the following factors as relevant to a determination whether the relationship is protected by the First Amendment: "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Id*. Notably, the Court stated that "we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id*. at 622.

Applying these factors and noting that gender was the only meaningful restriction on full membership in the U.S. Jaycees , the Court concluded that "Minnesota's compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms." *Id*. at 623. It is noteworthy that despite the large size and largely impersonal nature of the association, the Court nevertheless focused upon the state's "compelling interest" in upholding a restriction upon the members' associational freedoms.

In *Rotary Club of Duarte*, the Supreme Court again addressed the contours of freedom of association in the context of a statute that required a civic organization to admit females into membership. 481 U.S. at 541-42. The Court followed its earlier approach in *Roberts*, "considering separately the effect of the challenged state action on individuals' freedom of private association and their freedom of expressive association." *Id.* at 544-45.

Noting the size of Rotary clubs in California, the regular turnover in membership, and an emphasis on making the affairs of the clubs open to the public, the Court concluded that a California law requiring that women be admitted did not "interfere unduly with the members' freedom of private association." *Id*. at 547. When considering the claim that the statute violated the members' rights of expressive association, the Court concluded that the "slight infringement on Rotary members' right of expressive association" by the statute was justified by the state's "compelling interest in eliminating discrimination against women." *Id*. at 549.

In *Stanglin*, the Court addressed an ordinance that precluded those other than 14 to 18 year olds from patronizing certain dance-halls. 490 U.S. at 20-21. The Court held that "the activity of these dance-hall patrons - coming together to engage in recreational dancing - is not protected by the First Amendment." *Id.* at 25. The Court stated: "It is clear beyond cavil that dance-hall patrons, who may number 1,000 on any given night, are not engaged in the sort of 'intimate human relationships' referred to in *Roberts.*" *Id*. at 23. Rather, "[t]he hundreds of teenagers who congregate each night at this particular dance hall are not members of any organized association; they are patrons of the same business establishment." *Id*. at 24.

The lesson that I draw from these three cases is that First Amendment protections will only be extended to interpersonal relationships founded upon something more than common patronage of a commercial establishment. In the event that there is a relationship founded upon common membership in an organization, even if that organization is large and non-selective, the

members of that organization possess associational and expressive interests[13] that may be legitimately abridged upon a showing of a compelling state interest.

In view of the foregoing, I would conclude that the definition of criminal gang found in the ICGEA, i.e., an ongoing organization, association, or group of three or more persons, whether formal or informal, sharing a common name or common identifying sign or symbol, and whose members share common activities which may include criminal behavior (whether individually or collectively), implicates the First Amendment freedom of association for associational or expressive purposes. This leads me to consider whether the statute is overbroad or whether the statute advances a compelling state interest.

*1. Overbreadth*

The overbreadth doctrine is "strong medicine," and courts employ it only as a last resort. *Broadrick v. Okla.*, 413 U.S. 601, 613 (1973). If possible, a challenged statute should be given a limiting construction which avoids constitutional infirmity. *Id.* Where conduct, not speech, is involved, a court may only invalidate a statute if its overbreadth is substantial in relation to the statute's legitimate scope. *Id.* at 615. "Overbreadth is not substantial if, despite the fact that some constitutionally protected conduct is proscribed, the statute covers a wide range of conduct that is easily identifiable and within the [government's] power to prohibit." *State v. Doe*, 148 Idaho 919, 925, 231 P.3d 1016, 1022 (2010) (quoting *State v. Korsen*, 138 Idaho 706, 714, 69 P.3d 126, 134 (2003)). Significantly, overbreadth attacks have also been permitted in cases where the United States Supreme Court believed that "rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations." *Broadrick*, 413 U.S. at 612. Although laws that tend to restrict the right of individuals to associate must be tailored narrowly to serve legitimate governmental interests, *Aptheker*, 378 U.S. at 508 (1964); *Baggett v. Bullitt*, 377 U.S. 360, 372 n.10 (1964), overbreadth claims "have been curtailed when invoked against ordinary criminal laws that are sought to be applied to protected conduct." *Id*. at 613.

---

[13] Although political discourse is a common manifestation of expressive association, the expressive activity of a group entitled to First Amendment protections need not be politically oriented. *Stanglin*, 490 U.S. at 25 (referencing the statement in *Griswold v. Connecticut*, 381 U.S. 479, 483 (1965), that "[t]he right to freely associate is not limited to 'political' assemblies, but includes those that 'pertain to the social, legal, and economic benefit' of our citizens."). Because of the value of expressive association, even government infringements that merely chill expressive association must be finely tuned to achieve their objectives. *Scales*, 367 U.S. at 229.

Much of the United States Supreme Court's jurisprudence exploring the freedom of association developed during the Cold War,[14] when factions of the Communist Party advocated violent overthrow of the federal government. Communist groups were popularly perceived as involving violent and criminal contingents. State and federal laws were enacted which sought to regulate the membership and conduct of these groups, and many of these statutes were challenged on the grounds that they infringed upon the right to freedom of expressive association and imposed guilt by association. In *De Jonge v. Oregon*, state law criminalized the act of assisting in conducting a Communist Party meeting. 299 U.S. 353, 356-57 (1937). The Court held the statute unconstitutionally infringed upon the freedoms of speech and assembly, reasoning that because the discussion at a Communist Party meeting may be wholly lawful and never incite imminent violence or crime, the simple fact that a person organized a meeting sponsored by the Communist Party did not amount to illegal conduct. *Id.* at 364-65. The Court explained that:

> The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects. If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge.

*Id.* at 365. The Court held that government may not criminalize association with a group merely because it includes criminal factions. Rather, only if the members associate because they share the purpose of accomplishing a criminal act may their association be criminalized.

Intent to commit a crime was again the determinative factor in *Scales v. United States*, 367 U.S. 203 (1961). In that case, the United States Supreme Court upheld a federal statute that made it a crime to knowingly be a member of an organization which advocated violent overthrow of the government. *Id.* at 205. Although the statute did not include an express requirement that one's membership exist with the specific intent to accomplish the group's goal

---

[14]  I rely on case law from this era because it is the richest source of decisions from the United States Supreme Court relating to First Amendment rights of association and the power of the state and federal governments to interfere with those relationships. Further, I believe that the contemporary fear of the societal threat posed by gangs, and the legislative response thereto, mirror the perceived threat posed by the Communist Party and the corresponding legislative response during the Cold War era.

of violent overthrow, the Court looked to the structure and legislative history of the statute and construed it to include a requirement of specific intent. *Id.* at 206-19. Addressing the appellant's facial challenge to the statute under the First Amendment, the Court affirmed that guilt is personal and that "[m]embership, without more, in an organization engaged in illegal advocacy" is insufficient grounds to impose a criminal penalty. *Id.* at 224-25. Yet because the Court construed the statute to include a specific intent requirement, the Court held that the scope of the statute's infringement did not unconstitutionally extend to lawful association. *Id.* at 225. Rather, the Court reasoned that "the member for whom the organization is a vehicle for the advancement of legitimate aims and policies does not fall within the ban of the statute . . . . Such a person may be foolish, deluded, or perhaps merely optimistic, but he is not by this statute made a criminal." *Id.* at 229-30. The Court refused to impose guilt simply due to one's mere association with an organization that includes criminal factions.

The United State Supreme Court confirmed that the specific intent to commit a group's criminal purpose transforms an otherwise lawful association protected from government prohibition into an unlawful association subject to regulation and criminal sanction in *Aptheker v. Secretary of State*, 378 U.S. 500, 511 (1964)[15] and *United States v. Robel*, 389 U.S. 258, 262-63 (1967). In each case, the Court struck as facially overbroad statutory provisions regulating Communist organizations, holding that the provisions lacked the content and legislative history necessary to support judicial constructions that included a specific intent requirement. In *Robel*, the statute at issue prohibited individuals who professed membership in a Communist organization from obtaining or maintaining employment in any defense facility, and imposed criminal penalties upon those who disobeyed. 389 U.S. at 260. The Court determined that, lacking the necessary requirement of specific intent,

> [he] statute casts its net across a broad range of associational activities, indiscriminately trapping membership which can be constitutionally punished and membership which cannot be so proscribed. It is made irrelevant to the statute's operation that an individual may be a passive or inactive member of a designated organization, that he may be unaware of the organization's unlawful aims, or that he may disagree with those unlawful aims.

---

[15] Although *Aptheker* was decided on Fifth Amendment grounds, the United States Supreme Court subsequently noted that it also implicated the First Amendment right to freedom of association. *United States v. Robel*, 389 U.S. 258, 262-63 (1967).

*Id.* at 265-66. *Robel* and the cases that precede it make clear that legislative curtailments of the freedom of expressive association must be finely tuned to impact only the criminal intent and conduct which the legislative body has the power to proscribe within the bounds of the United States Constitution. As the Supreme Court observed in a case arising from the social unrest of the early 1970s, it "has consistently disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization." *Healy v. James*, 408 U.S. 169, 185-86 (1972).

The State argues that a criminal gang is not a type of association protected by the First Amendment because it is neither an intimate nor expressive association. Other jurisdictions have recognized that criminal gangs are entitled to some degree of freedom of association, and as a consequence have insisted upon the existence of a specific intent requirement in their anti-gang statutes. In *Helton v. State*, 624 N.E. 2d 499, 506 (Ind. Ct. App. 1993), a state statute made it a felony to commit criminal gang activity by "knowingly or intentionally actively participat[ing] in a criminal gang," i.e., a group with at least five members who were required to commit a felony to become a member and who supported or participated in the commission of a felony to remain a member. Consistent with United States Supreme Court precedent, the Indiana court construed the statute to include a requirement that the actor possess the specific intent to further the group's criminal conduct. *Id.* at 508. The court recognized that individuals may join a gang for non-criminal purposes, and stated that "the member for whom the criminal gang is an instrument for the advancement of legitimate goals and policies does not fall within the Gang Statute's ban since he lacks the requisite specified intent to further criminal conduct." *Id.* at 511. Since the statute included the specific intent requirement, it did not infringe upon the right to freedom of association. *Id.* Likewise, a California statute that imposed enhanced criminal sanctions for crimes "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" did not violate freedom of association because it included a specific intent requirement. *People v. Gardeley*, 927 P.2d 713, 725 (Cal. 1996).

At least one court has concluded that a criminal gang is simply not a form of association protected by the First Amendment. *State v. Bennett*, 782 N.E.2d 101 (Ohio Ct. App. 2002). However, that court did not engage in a thorough freedom of association analysis, instead citing *City of Chicago v. Morales*, 427 U.S. 41, 53, for the proposition that gang members' social

contact is unprotected, and *United States v. Choate*, 576 F.2d 165, 181 (9th Cir. 1978), for the proposition that the right of association does not extend to organizations that commit felonies. This assessment is inadequate. The United States Supreme Court's statement in *Morales* that the right of association does not include "social contact between gang members and others" must be understood in the context of the statute there at issue. *Morales*, 427 U.S. at 53. *Morales* dealt with a statute that prohibited individuals, gang member or not, from loitering in public areas if they had received a relocation request from a peace officer. *Id.* at 47. Thus, similar to the unprotected social association in *Stanglin*, the conduct not entitled to First Amendment protections in *Morales* was the act of loitering amongst and socializing with both gang members and nonmembers in a public place. Further, the Ohio court's interpretation of *Choate* is a stretch, given that the Ninth Circuit there did not hold that the freedom of association does not extend to an organization which exists for many purposes, including the commission of felonies. Rather, the court stated simply that "the practice of associating with compatriots in crime is not a protected associational right . . . ," i.e., that associations formed for the sole purpose of conducting criminal activity are not entitled to First Amendment protections. 576 F.2d at 181. To interpret the Ninth Circuit's holding otherwise would fly in the face of the Cold War era cases decided by the United States Supreme Court, each of which required that, in order to be made criminal, membership must be accompanied by the specific intent to commit the group's criminal purpose. Thus, neither *Morales* nor *Choate* preclude the conclusion that groups which may be identified as criminal gangs have associational aspects and are therefore entitled to First Amendment protections.

I believe that the ICGEA is unconstitutionally overbroad because some groups that meet the the Act's definition of "criminal gang" may be intimate or expressive associations that are entitled to First Amendment protections. Looking back to the Cold War era, for example, if the ICGEA had been in effect and two or more members of the Communist Party had attempted murder, burglary, or concealment of evidence, the Party would have been a criminal gang under the ICGEA. Under the Act's Recruiting Provision, recruitment of new members to the Party would have been a criminal act. Yet prosecution under the Recruiting Provision would have been unconstitutional, as the members of the Communist Party collectively engaged in the primary activities of constitutionally protected speech and expressive conduct, such that association with the Communist Party was guarded by the United States Constitution. As U.S.

35

Supreme Court precedent has demonstrated, the First Amendment would not permit government infringements upon all associations with the Communist Party, but rather only those associations formed with the specific intent that they advance or achieve a criminal purpose.

From a more contemporary perspective, the ICGEA definition reaches a group of political activists whose members engage in criminal activity in order to pursue their political objectives, such as extremist environmental and animal rights groups. While the First Amendment permits the government to prosecute the criminal conduct of the members of activist groups', it precludes one's prosecution for mere membership in, or association with, such an organization. Prosecution and conviction on such grounds amounts to guilt by association, a concept repeatedly rejected as unconstitutional by the United States Supreme Court.

Since the First Amendment exists to shield minority dissident groups from suppression, statutes that infringe upon minority groups' expression and association, without limiting such infringements to the conduct not protected by the First Amendment, are substantially overbroad and thus invalid. Further, as the courts in both *Scales* and *Helton* acknowledged, statutes that criminalize membership without a specific intent requirement impose punishment upon the member who is "foolish, deluded, or perhaps merely optimistic," or who joins the group "for the advancement of legitimate goals and policies," yet who has no criminal purpose. The U.S. Constitution protects such members from criminal punishment.

These are only a few examples of the types of First Amendment protected associations that fit within the ICGEA definition of "criminal gang." Given that the United States Supreme Court has declined to limit intimate association to purely familial relationships, I believe that intimate groups, formed between friends for purposes of socializing in private, passing on cultural traditions, transmitting shared ideals and beliefs, and investing in the development and exploration of members' individual identities, are also intimate associations entitled to First Amendment protections. Since a group that does not have an expressive purpose may possess these characteristics, in addition to the characteristics that cause it to fall within the I.C. § 18-8502(1) definition of a criminal gang, groups commonly known as "gangs" may be intimate associations entitled the First Amendment right to freedom of association.

It may be that some groups are formed and maintained for a wholly criminal purpose, and that as applied to those groups, the ICGEA would pose no threat to the individual rights protected by the Constitution. However, the ICGEA, by its inclusion of the phrase "one of its

36

primary activities," is not restricted to such associations. The doctrine of overbreadth looks to all conceivable applications of a statute to determine whether the statute is invalid because it infringes on First Amendment freedoms. Since the ICGEA sweeps broadly enough to affect many types of groups that may qualify as intimate or expressive associations, it is substantially overbroad relative to its legitimate aim of proscribing that conduct of "criminal gangs" which is in fact criminal. This conclusion does not prevent the enactment of laws that criminalize gang conduct. Rather, it simply requires that those laws be tailored to prohibit only the criminal conduct they seek to thwart, while avoiding unnecessary infringements upon the constitutional right to freedom of association.

In *Elfbrandt v. Russell,* 384 U.S. 11 (1966), the Supreme Court specifically noted the situation which I believe is presented by the ICGEA: organizations and associations may have multiple objectives, some legal and others illegal. *Id.* at 15. The Court struck down the statute in question, stating:

> Those who join an organization but do not share its unlawful purposes and who do not participate in its unlawful activities surely pose no threat, either as citizens or as public employees. Laws such as this which are not restricted in scope to those who join with the 'specific intent' to further illegal action impose, in effect, a conclusive presumption that the member shares the unlawful aims of the organization.

*Id.* at 17.

Based upon the foregoing analysis, I believe that the statute is facially overbroad in light of the Legislature's decision to eliminate the requirement that a party recruiting[16] another to join a criminal gang do so with the specific intent that the recruit engage in criminal conduct. Rather, the statute permits conviction even where one recruits another to join a gang to advance or achieve perfectly legal objectives.

This leads to the consideration of whether the statute is subject to a saving construction. In the course of determining whether to impose a saving construction, the United States Supreme Court has declined to rewrite a statute to the point of changing its clear purpose. *Aptheker*, 378 U.S. at 515 ("It must be remembered that '[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of

---

[16] The State asserts that because I.C. § 18-8504 criminalizes recruitment rather than membership, it does not infringe upon the right to freedom of association. However, the United States Supreme Court has recognized "a prohibition of potential association with nonmembers" as an infringement under the First Amendment. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 215 (1986).

perverting the purpose of a statute . . . ' or judicially rewriting it." (quoting *Scales*, 367 U.S. at 211)). Given the Legislature's decision to eliminate the requirement of specific intent, any saving construction, including the construction advanced by the majority, would be contrary to clear legislative intent.. Thus, I do not believe that it can be so saved.

### 2. *Compelling state interest*

The State places substantial emphasis on the United States Supreme Court's holding in *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705 (2010), in which a constitutional challenge was levied against a federal statute that criminalized the provision of material support to foreign terrorists by one who knew either that the group committed terrorist acts or that the group was a federally-designated terrorist group. The statute at issue in *Humanitarian Law Project* did not criminalize mere membership, but instead prohibited speech in the form of the knowing provision of material support. *Id.* at 2718. The Court upheld the statute even though it did not include a requirement that the defendant possess the specific intent to further the illegal conduct of the terrorist organization. *Id.* at 2717. Throughout the opinion, the Court framed "the Government's interest in combating terrorism [a]s an urgent objective of the highest order." *Id.* at 2724. In light of the "sensitive and weighty interests of national security and foreign affairs," the Court afforded substantial deference to the political branches' assessment of the severity of the dangers caused by the knowing provision of material support to foreign terrorist groups. *Id.* at 2727. The Court concluded that, given the unique circumstances surrounding foreign terrorism, the challenged provisions were justified and the statute was constitutional on the grounds challenged. *Id.* at 2730-31.

The unique facts and narrow holding of *Humanitarian Law Project* distinguish it from and make it inapplicable to cases in which statutes affect the associational rights of those who engage in expressive association with domestic organizations, and the State's reliance thereon is therefore misplaced. I do not believe that there is a compelling state interest that justifies the broad sweep of the Recruiting Provision. Although there is a compelling governmental interest in national security, Idaho may advance its legitimate and compelling state interest in prevention of criminal offenses either by imposing a specific intent requirement in the Recruiting Provision or by the use of traditional prosecutorial tools of conspiracy and solicitation.

For the foregoing reasons, I respectfully dissent from Part III.C.ii of the Court's opinion.

**III. Part III.D – Issues not addressed in the majority opinion.**

I join in the Court's decision not to address Manzanares' claims that the information failed to contain all necessary elements of the offense and the sufficiency of the evidence. I do so because I believe that the Recruiting Provision is facially unconstitutional and cannot be saved by a construction that would impose a specific intent requirement. Therefore, I join in the result reached by the majority.